LAWRENCE M. STALEY AND KENNETH W. CHEEK, TRADING AS STALEY'S CHARCOAL STEAK HOUSE v. THE CITY OF WINSTON-SALEM AND ARCHIE ELLEDGE, CARL CHITTY, FLOYD S. BURGE, JR., JAMES J. BOOKER, CARL H. RUSSELL, CARROLL POPLIN, ROSSIE F. SHORE, AND THOMAS L. OGBURN, MEMBERS OF THE BOARD OF ALDERMEN OF THE CITY OF WINSTON-SALEM.

(Filed 12 December 1962.)

1. **Intoxicating Liquor § 2—**
   The State Board of Alcoholic Control exercises sole discretionary power in determining the fitness of an applicant for a permit to sell wine, and the places where wine may be sold, and the State and local taxing authorities in issuing licenses are relieved of responsibility in regard thereto.

2. **Municipal Corporations § 24—**
   Local ordinances cannot override statutes applicable to the entire State.

3. **Municipal Corporations § 25; Intoxicating Liquor § 2—**
   Where an applicant for a municipal license to sell wines on the premises is operating a business permitted by the municipality's zoning ordinances under its provisions relating to pre-existing nonconforming uses, and has complied with all of the requirements of the Alcoholic Beverage Control laws and the regulations of the State Board of Alcoholic Control adopted thereunder, the municipality is without power to refuse applicant a license to sell wine in connection with its business.

APPEAL by respondents from *Phillips, J.,* May 1962 Civil Term of FORSYTH.

*Deal, Hutchins and Minor by Roy L. Deal for petitioner appellees.*
*Womble, Carlyle, Sandridge & Rice by I. E. Carlyle and H. G. Barnhill, Jr., for respondent appellants.*

RODMAN, J. This appeal requires an answer to only one question: Can respondents prohibit the sale of unfortified wines for consumption in petitioners' restaurant?

The facts on which the answer must be based were stipulated. Summarized, they are: Winston-Salem, acting under statutory authority, adopted a zoning ordinance on 26 September 1955. Petitioners' property was not then within the corporate limits of the city, but the ordinance was applicable to it by legislative permission. C. 777, S.L. 1953. The property, by the enlargement of the city's boundaries, is now part of Winston-Salem. When the zoning ordinance was adopted, petitioners' property was and has been continuously since that date used as a restaurant. It qualifies for Grade A rating.

The operation of a restaurant is not permitted in residential A 1 zones. Such use is a "nonconforming" use. The ordinances provide: "A nonconforming building or use may be continued, and may be changed to another nonconforming use of the same or a more restricted classification. . .The vacation of a nonconforming building or use for a consecutive period of two years shall be regarded as a permanent vacation and, thereafter, the building shall not be reoccupied except in conformity with the regulations of the district in which it is located, and the use may not be resumed."

The ordinances also provide: "It shall be unlawful for any person to sell beer or wine on any premises in a residential area in the city on which a business may now be conducted as a nonconforming use under chapter 48 of this Code except for such premises on which beer and wine are now being sold under proper permit issued pursuant to the laws of the state and the ordinances of the city, and the violation hereof shall constitute a misdemeanor."

Wine was sold on petitioners' premises until 3 January 1957, when they voluntarily ceased selling. On 17 March 1960 the city, upon application, issued a license to sell. A few days after petitioners began selling wines, the city, acting on advice of counsel that such sale was prohibited by the ordinance, applied for and obtained a temporary restraining order prohibiting such sales. The license under which petitioners made sales in 1960 having expired, they applied to the revenue department of the city for a license on 1 May 1961. The license was issued, but revoked on 6 November 1961.

In addition to the stipulated facts summarized above, the parties expressly stipulated:

"7. The petitioners have complied with all of the requirements of the Alcoholic Beverage Control laws of the State of North Carolina contained in Chapter 18 of the General Statutes of North Carolina and with all of the regulations of the State Board of Alcoholic Control adopted thereunder.

"8. The City of Winston-Salem and its officers have made no claim whatever against the petitioners that they have not complied with all

the requirements of the State laws regulating the sale of alcoholic beverages or the regulations of the State Board of Alcholic Control.

"9. The only grounds on which the respondents have revoked or purported to revoke the wine license permit of the petitioners, No. 18, issued by the City of Winston-Salem are Section 3.1 and 48-19.2 of the Ordinances of the City of Winston-Salem. . . ." (These are the sections previously quoted.)

The correct answer to the question presented requires not only an examination of existing statutes regulating the sale of alcoholic beverages but an understanding of the reasons which led to the enactments.

A special session of the Legislature convened in January 1908 to consider legislation prohibiting the sale of intoxicating beverages. C. 71 of that session, ratified 31 January 1908, made it unlawful to sell "any spirituous, vinous, fermented or malt liquors or intoxicating bitters." A proviso permitted manufacture and sale of wines and ciders made from grapes, berries, or fruits. The statute provided it should take effect on the first day of January 1909, if approved by a majority vote at an election to be held in May 1908. The electors approved the act. Thereafter the chapter in our code laws dealing with intoxicating liquors bore the title "Prohibition." See c. 66, C.S. 1919.

The movement to outlaw the sale of intoxicating beverages was not confined to North Carolina. Congress submitted and the states ratified the Eighteenth Amendment to the Constitution of the United States prohibiting the manufacture, sale, and transportation of intoxicating liquors.

The 1923 Legislature adopted the Turlington Act, now art. 1 of c. 18 of the General Statutes.

Constitutional and statutory provisions absolutely prohibiting the manufacture or sale of intoxicating beverages failed to produce the predicted and desired results with respect to the use of such beverages. The stringent prohibition incorporated in the Constitution of the United States by the Eighteenth Amendment was relaxed by the Twenty-first amendment which merely prohibits transportation in violation of state law.

Soon after the Legislature convened in 1935, it became apparent that efforts would be made to replace, in some portions of the state, total prohibition with governmental control. C. 418, P.L. 1935, ratified 11 May 1935, made the Turlington Act inapplicable to New Hanover County. It created a county liquor commission to be known as New Hanover County Alcoholic Beverage Control Board, invested with complete control over the importation, transportation, sale, and distribution of alcoholic beverages in that county. The statute was not, however, to become effective unless approved by the electorate of New Hanover County. It was so approved.

Shortly after the introduction of the bill relating to the sale of alcoholic beverages in New Hanover County, a similar bill relating to Pasquotank County was introduced. It likewise was ratified 11 May 1935 and became c. 493, P.L. 1935. As enacted it included Pasquotank, Carteret, Craven, Onslow, Pitt, Martin, Beaufort, Halifax, Franklin, Wilson, Edgecombe, Warren, Vance, Lenoir, Rockingham, Nash, and Greene Counties and Southern Pines and Pinehurst in Moore County.

C. 393, P.L. 1935, authorized any person growing grapes, fruits or berries to make therefrom wines having only such alcoholic content as natural fermentation would produce. Wines so made were declared food, which could be sold for consumption "in hotels and bona fide restaurants enagaged in selling food and serving meals." Secs. 3 and 2, c. 393, P.L. 1935.

Foods were subject to sales tax enacted in 1933. Licensing of outlets selling wines produced by fermentation, declared by the 1935 Legislature a food, were natural objects to tax. Schedule F of the Revenue Act of 1937 (c. 127, P.L. 1937) is the foundation on which art. 4, c. 18, of the General Statutes was built. One seeking to retail wines under the Revenue Act of 1937 had to apply to the governing authority of a municipality or to the county commissioners if the sale was to be made outside a municipality. In substance the provisions of sec. 511 of the Revenue Act of 1937 now appear as G.S. 18-75. Sec. 513 of the Revenue Act of 1937, now in substance G.S. 18-77, made it maadatory on the governing body of a municipality to issue the license when proper application had been made unless the application showed licensee was disqualified because convicted of a felony involving moral turpitude or violation of the prohibition laws of the state or nation.

Shortly after the 1937 Legislature convened, a bill "TO PROVIDE FOR THE MANUFACTURE, SALE, AND CONTROL OF ALCOHOLIC BEVERAGES IN NORTH CAROLINA" was introduced. In substance it gave approval to the philosophy exemplified in the so-called New Hanover and Pasquotank bills adopted by the 1935 Legislature. Any county in the State, upon approval by the voters of that county, might set up stores for the sale of alcoholic beverages. This bill became c. 49, P.L. 1937. There was a notable difference, however, between the 1935 acts and the 1937 act in the definition of alcoholic beverages. Sec. 24 of the 1937 act defined the term alcoholic beverages as "alcoholic beverages of any and all kinds which shall contain more than twenty-one per centum of alcohol by weight and this Act is not intended to apply to or regulate the possession, sale, manufacture or transportation of beer, wines or ales containing a lower alcoholic

content than above specified and whenever the term alcoholic beverage is used in this Act it shall be construed as defined in this section." This definition was later changed to read "twenty-four per centum by volume," c. 411, sec. 1(k), P.L. 1937, and subsequently reduced to fourteen per centum by volume, c. 339, sec. 3, P.L. 1941; G.S. 18-60.

Time again demonstrated that it was not easy to draft legislation which would solve the multitudinous problems arising out of the sale and consumption of alcoholic beverages. The fitness of an applicant and the appropriateness of sales outlets could not readily be solved by the answers to generalized questions. The 1941 Legislature found it advisable to limit the sale of fortified wines to ABC stores. C. 339, P.L. 1941; art. 5, c. 18, General Statutes.

Placing fortified wines under the control of the ABC stores failed to solve the problem. The preamble to c. 903, S.L. 1945, reciting the failure of prior legislation to adequately protect the public and hence the need of remedial legislation, expressly stated: ". . . the public welfare demands that there be some regulation and supervision of the identity, quality and purity of wines sold or offered for sale in this State, and some restriction of the places where such wines are sold for consumption on the premises. . .

". . .for purposes of convenience, economy and efficiency, such supervision and regulation should be vested in an appropriate agency of the State already established instead of in a new agency, and the State Board of Alcoholic Control is the proper agency to administer such supervision and regulation. . ."

To rectify the conditions recited in the preamble, the Legislature enacted what are now the first six subdivisions of G.S. 18-109.

The 1947 Legislature found it necessary to further limit the places where sales might be made and to enlarge the powers of the State Board of Alcoholic Control. C. 1098, S. L. 1947. It prohibited the sale of wines in pool rooms or billiard parlors. It added what are now subsections 7 and 8 of G.S. 18-109.

Since 30 April 1947, when c. 1098 of the Session Laws of 1947 became effective, one desiring to sell wines must (1) obtain a permit from the State Board of Alcoholic Control, and (2) licenses from the taxing authorities. The State Board exercises sole discretionary powers in determining fitness of the applicant, the number of retail outlets permitted in any locality, and supervision over those who sell wines. It may revoke or suspend such permits for cause. G.S. 18-109 relieves licensing authorities, state and local, of responsibility with respect to the fitness of the applicant or place where wines may be sold. Of course on premises licenses are limited to those described in G.S. 18-73. The statute has been in effect for more than fifteen years. To interpret

it so as to permit local communities to override and set at nought the conclusions reached by the State Board might well reproduce the condition deplored by the 1945 Legislature. Local ordinances cannot override statutes applicable to the entire State. *Davis v. Charlotte*, 242 N.C. 670, 89 S.E. 2d 406.

Petitioners' right to operate the restaurant being conceded, the zoning ordinance could not set at nought a statewide statute permitting the sale of wines in such restaurants. Such sales are a permitted part of authorized business.

Affirmed.